DECISION AND JUDGMENT ENTRY JUDGMENT ENTRY
{¶ 1} Mary Wolfson contends the Lawrence County Common Pleas Court erred in revoking her community control and sentencing her to a prison term of one year because the State failed to prove that she willfully or intentionally violated the terms of her sanctions. We find that the State presented some competent, credible evidence that Wolfson violated the conditions of her community control by using alcohol excessively, using illegal drugs, and lying to the staff of the Bureau of Community Control, and that the State was not required to prove a mens rea in connection with these acts. Therefore, the trial court did not abuse its discretion. Wolfson also argues that the court erred in sentencing her to more than the minimum term of imprisonment without first making the findings required by R.C. 2929.14(B). Wolfson's argument is meritless because the court sentenced Wolfson to only one year in prison, the minimum sentence available for a third degree felony, and thus was not required to make the R.C. 2929.14(B) findings. We affirm the trial court's judgment.
 {¶ 2} In August 2002, Wolfson pled guilty to one count of obstructing justice, a third degree felony. The trial court sentenced Wolfson to three years of community control sanctions under Intensive Supervised Probation (ISP), including six months in a community based correctional facility. The court advised Wolfson that if she violated the terms of community control it would sentence her to one year in prison, and ordered Wolfson to pay court costs.
 {¶ 3} Wolfson completed her six month sentence at the community based correctional facility and was released. However, the State subsequently filed a motion to revoke Wolfson's community control sanctions on the grounds that: (1) Wolfson was arrested in Ashland, Kentucky for the crime of alcohol intoxication; (2) Wolfson reported to the Bureau of Community Corrections with "track marks" on her arm and tested positive for morphine use; (3) Wolfson initially denied illegal drug use but later admitted that she injected MS Contin with some acquaintances; and (4) Wolfson had not paid court costs. At the conclusion of a revocation hearing, the trial court found that Wolfson violated the terms of her community control sanctions/ISP and sentenced her to a prison term of one year, with credit for time served.
 {¶ 4} Wolfson timely appealed the court's judgment, assigning the following errors: "Assignment of Error Number One — The trial court committed prejudicial, reversible error when it revoked the appellant's community control sanctions in the absence of willful, intentional conduct on the part of appellant.Assignment of Error Number Two — The trial court committed prejudicial, reversible error in imposing a sentence on appellant that was contrary to felony sentencing guidelines, where there was no finding that a lesser sentence would demean the seriousness of the offense or not adequately protect the public, because said sentence was not the shortest or minimum required prison term."
 I. {¶ 5} In her first assignment of error, Wolfson argues that the court erred in revoking her community control sanctions because the State failed to prove that she intentionally or willfully breached the terms of her sanctions.
 {¶ 6} Community control sanctions essentially replace the concept of "probation" in Ohio's criminal justice system. See generally Griffin Katz, Ohio Felony Sentencing Law (2003 ed.) 682-683, §§ 6:1-6:2. Although probation and community control sanctions are similar in their operational effect, probation was an "expression of leniency in place of a deserved prison sentence" while community control sanctions are imposed as "the sentence that is deserved and which the court has deemed to be most reasonably calculated to protect the public from future crime." Id. at § 6:1. Most of the case law examining probation revocations is equally applicable to the revocation of community control sanctions. See, e.g., State v. Weaver,141 Ohio App.3d 512, 2001-Ohio-3216, 751 N.E.2d 1096 (applying due process requirements of probation revocation to revocation of community control sanctions); State v. Miller, Franklin App. No. 03AP-1004, 2004-Ohio-1007 (applying same burden of proof in determining whether defendant violated terms of community control as applied when determining if probation violation occurred);State v. Talty, Medina App. No. 02CA0087-M, 2003-Ohio-3161 (applying identical test in determining constitutionality of community control condition as previously applied to determination of constitutionality of probation condition).
 {¶ 7} Because a community control revocation hearing is not a criminal trial, the State does not have to establish a violation with proof beyond a reasonable doubt. State v. Payne, Warren App. No. CA2001-09-081, 2002-Ohio-1916, citing State v. Hylton
(1991), 75 Ohio App.3d 778, 782, 600 N.E.2d 821. Instead, the prosecution must present "substantial" proof that a defendant violated the terms of her community control sanctions. Id., citing Hylton at 782. Accordingly, we apply the "some competent, credible evidence" standard set forth in C.E. MorrisCo. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279,376 N.E.2d 578, to determine whether a court's finding that a defendant violated the terms of her community control sanction is supported by the evidence. See State v. Umphries (July 9, 1998), Pickaway App. No. 97CA45; State v. Puckett (Nov. 12, 1996), Athens App. No. 96CA1712. This highly deferential standard is akin to a preponderance of the evidence burden of proof. See State v.Kehoe (May 18, 1994), Medina App. No. 2284-M.
 {¶ 8} Once a court finds that a defendant violated the terms of her community control sanction, the court's decision to revoke community control may be reversed on appeal only if the court abused its discretion. Columbus v. Bickel (1991),77 Ohio App.3d 26, 38, 601 N.E.2d 61. An abuse of discretion connotes more than an error in law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.State v. Maurer (1984), 15 Ohio St.3d 239, 253, 473 N.E.2d 768.
 {¶ 9} The State introduced the testimony of five witnesses at the revocation hearing while the appellant produced three witnesses. A summary of this evidence is presented in the Appendix.
 {¶ 10} At the conclusion of the hearing, the trial court found that Wolfson violated the terms of her community control by: (1) using alcohol; (2) using illicit narcotics, i.e. MS Cotton; (3) lying to and intentionally misleading community control officers; and (4) failing to pay court costs since March 2003. The court noted that multiple officers testified that Wolfson was intoxicated and that Wolfson's "disgusting" behavior on the videotape clearly demonstrates her high level of intoxication. The court found that Wolfson admitted lying to the community control officers and rejected her claim that she concocted the story about her MS Cotton use.
 {¶ 11} Wolfson makes several arguments in support of her first assignment of error. First, relying on State v. Bleasdale
(1990), 69 Ohio App.3d 68, 590 N.E.2d 43, Wolfson contends that the State failed to prove that she "willfully and intentionally" violated the terms of her community control sanctions. InBleasdale, the trial court ordered the appellant to complete a specific drug program as a condition of his probation. After determining that the appellant suffered from several mental disorders that the drug program staff was incapable of handling, the appellant's probation officer terminated him from the program and the State requested that his probation be revoked. The court revoked the appellant's probation solely on this ground. However, the Eleventh District Court of Appeals found that the trial court abused its discretion and overturned the court's decision because the appellant did not willfully or intentionally violate the conditions of his probation. The appellate court concluded that the appellant was cooperating with the treatment program and his termination was due to the program's inability to administer an individual with the appellant's mental problems.
 {¶ 12} The facts supporting the revocation of Wolfson's community control sanctions are clearly distinguishable from those in Bleasdale. The court revoked Wolfson's community control solely based on her voluntary conduct, not on the basis of conditions over which Wolfson had no control. Wolfson chose to drink alcohol, use illegal drugs, and lie to the community control officers. Moreover, the State only had to prove that Wolfson violated the terms of her community control sanctions, not that she had a mens rea of "willfulness," before the court could revoke Wolfson's community control sanctions. See State v.Stockdale (Sept. 26, 1997), Lake App. No. 96-L-172 (holding that the State need not prove a means rea element before the court can revoke an offender's probation). We reject Wolfson's first argument.
 {¶ 13} Next, Wolfson argues that there is insufficient proof in the record to support the trial court's finding that she used illegal drugs. Wolfson contends that the State failed to demonstrate the accuracy of the drug test and that urinalysis results are inadmissible unless the testifying witness has independent knowledge of or responsibility for the records depicting the urinalysis results.
 {¶ 14} Although community control revocation proceedings are specifically excluded from coverage under Evid.R. 101(C)(3), the admission of hearsay evidence can run afoul of a defendant's due process rights. State v. Ball, Scioto App. No. 02CA2866, at ¶ 20, 2003-Ohio-5848. When the State relies upon a positive urinalysis to prove a defendant used drugs, the State should produce a witness who can testify about the reliability of the test results. Columbus v. Lacy (1988), 46 Ohio App.3d 161, 165,546 N.E.2d 445; State v. Smith (Nov. 14, 1990), Scioto App. No. CA1847. However, the probationer's right to confrontation is conditional, and thus subject to a finding of good cause for denying the right. See Smith for a discussion of balancing the interests involved in the probation revocation context, which is more flexible in its search for the facts than a criminal trial.
 {¶ 15} Although the State introduced the testimony of Lynn Stewart, who administered the test to Wolfson and interpreted the results, Stewart could not testify as to the accuracy of the test or the science behind the test. However, we conclude that the record contains substantial evidence of Wolfson's drug use even without considering the results of the urinalysis.
 {¶ 16} Several witnesses testified that Wolfson admitted using MS Cotton in violation of the terms of her community control sanctions. Wolfson did not deny making this admission but refuted its accuracy by stating she was under "duress" and would have said "anything" to terminate the questioning by Bowen. The court clearly rejected Wolfson's explanation for her admission and concluded that Wolfson used MS Cotton. We leave such credibility determinations to the trial court.
 {¶ 17} Even assuming that the court improperly limited Wolfson's due process rights to confront a witness regarding the urinalysis results, a court's admission of evidence is harmless when other evidence supports the judgment. State v. Williams
(1988), 38 Ohio St.3d 346, 349, 528 N.E.2d 910, 916. Moreover, a violation of a probationer's right to confront a witness is harmless when she admits to violating a term of her probation.State v. Stowers (Jan. 31, 1985), Cuyahoga App. Nos. 48572, 48575, 48576, 48577, 48578, 48584, 48590, 48872, and 48873. See, also, State v. Christian, Champaign App. No. 2000-CA-23, 2001-Ohio-1522 (holding that violation of defendant's right to confront witness regarding urinalysis results was harmless when defendant admitted cocaine use after positive rapid drug screen test). Because there is sufficient evidence to support the court's finding that Wolfson injected MS Cotton while on community control without considering the urinalysis results, we reject Wolfson's claim that the court's finding of illegal drug use is unsupported by the record.
 {¶ 18} Third, Wolfson argues that the court erred in failing to consider the uncontroverted testimony that she suffers from severe mental disorders when revoking her community control sanctions. Wolfson relies upon State v. Qualls (1988),50 Ohio App.3d 56, 552 N.E.2d 957, where the appellant argued that he was insane at the time he committed his probation violations and that the trial court should have considered the evidence of his insanity before revoking his probation. The Tenth District Court of Appeals held that insanity is not a complete defense in a revocation hearing, but is a mitigating factor which the trial court should consider when a defendant raises the issue. Id. at 60.
 {¶ 19} Wolfson asserted at the hearing that she suffered from various mental disorders and defense counsel questioned certain witnesses about their awareness of these disorders. However, Wolfson did not produce any medical testimony to establish that her alleged mental disorders caused her to violate the terms of her community control. Moreover, Wolfson did not claim to be insane at the time she violated her community control sanctions or ask the trial court for a competency hearing. See State v.Schlecht, Champaign App. No. 2003-CA-3, 2003-Ohio-5336 (holding that trial court did not err in failing to consider defendant's mental health problems as mitigation where defendant failed to produce evidence documenting the extent of his mental problems, did not claim he was insane, and did not seek a competency evaluation). Because Wolfson failed to establish an adequate record for mitigation, the trial court did not err in discrediting her claims of mental health problems.
 {¶ 20} Lastly, Wolfson argues that the trial court erred in revoking her community control sanctions based on her failure to pay court costs. It is a violation of the Equal Protection Clause of the United States Constitution to revoke a defendant's probation simply because she is too poor to pay restitution where the record contains no evidence that the failure to pay was willful or intentional or that failure to obtain employment, in order to pay, was willful or intentional. State v. Scott
(1982), 6 Ohio App.3d 39, 41, 452 N.E.2d 517. Wolfson testified that she has applied for employment but is unable to work because of various medical conditions. Although Wolfson introduced no other evidence to support her claim that she is unable to pay the court costs or to work, the State did not prove that Wolfson's failure to pay court costs or failure to obtain employment was willful or intentional. Therefore, a revocation of Wolfson's community control sanctions solely on this basis would violate Wolfson's equal protection rights.
 {¶ 21} However, the trial court based its decision to revoke Wolfson's community control sanctions on far more than her failure to pay ordered court costs. The court also found that Wolfson drank alcohol until she became intoxicated, used illegal drugs, and lied to the community control officers. A review of the record demonstrates that the court's decision to revoke Wolfson's community control sanctions was also based on these three violations, not solely on Wolfson's failure to pay the court costs. Because the trial court properly revoked Wolfson's community control on these other violations, any error in terminating her community control sanction for failure to repay court costs is harmless.
 {¶ 22} Having carefully reviewed the record and each of Wolfson's arguments, we conclude that the trial court's finding that Wolfson violated the conditions of her community control was supported by some competent, credible evidence. Accordingly, the decision to revoke the community control sanction was not unreasonable, arbitrary or unconscionable. We overrule Wolfson's first assignment of error.
 II. {¶ 23} R.C. 2953.08(A)(4) provides for an appeal if a sentence is contrary to law. In her second assignment of error, Wolfson argues that the court erred in sentencing her to more than the minimum prison term without first finding that a lesser sentence would demean the seriousness of the offense or not adequately protect the public.
 {¶ 24} Under R.C. 2929.15(B), a trial court has three options when an offender violates the conditions of her community control. The trial court can (1) lengthen the term of the community control sanction, (2) impose a more restrictive community control sanction, or (3) impose a prison term. If the court imposes a prison term, the term imposed must be within the range of prison terms specified in the notice to the offender at the original sentencing hearing.
 {¶ 25} If the court elects to impose a prison term on an offender, the court shall impose the shortest prison term authorized for the offense unless (1) the offender was serving a prison term at the time of the offense, or the offender previously had served a prison term, or (2) the court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others. R.C. 2929.14(B). The prison term imposed after a violation of a community control sanction must comply with this mandate. Statev. Saunders (2000), 138 Ohio App.3d 221, 740 N.E.2d 1121
(addressing issue of maximum sentence).
 {¶ 26} Wolfson pled guilty to obstructing justice in violation of R.C. 2921.32(A)(5), a third degree felony. For the commission of a third degree felony, the prison term is one, two, three, four or five years. R.C. 2929.14(A)(3). Thus, when the trial court sentenced Wolfson to a one year term of imprisonment, it sentenced her to the shortest prison term authorized and was not required to make either of the findings delineated in R.C.2929.14(B). Wolfson's second assignment of error is overruled.
 {¶ 27} Having found no merit in either of Wolfson's assigned errors, we affirm the judgment of the trial court.
Judgment Affirmed.
 APPENDIX {¶ 28} Janet Hieronimus testified that she is a Community Corrections Officer for the Intensive Supervision Program at the Bureau of Community Corrections. Wolfson is one of the offenders she monitors. Hieronimus testified that Wolfson enrolled in the community control supervision program in August 2002 but did not actually begin the program until February 2003, after her release from an inpatient rehabilitation facility. Wolfson reviewed the conditions of her supervision and signed an acknowledgment delineating those conditions. Hieronimus identified a copy of that acknowledgment, which the State introduced into evidence.
 {¶ 29} Lynn Stewart testified that she is an Administrative Assistant employed by the Bureau of Community Control. When Hieronimus is not in the office, Stewart is responsible for meeting with the offenders Hieroniumus supervises.
 {¶ 30} On July 15, 2003, Wolfson reported to the Bureau for her weekly check-in. Prior to reporting that day, Wolfson phoned Stewart and informed her that she'd been jailed in Kentucky for alcohol intoxication. When Wolfson appeared, Stewart suspected she had used drugs because Wolfson was wearing a long-sleeved shirt on a warm day. An offender who reported earlier in the day had also been wearing long sleeves and he tested positive for drugs. Stewart decided to perform a urinalysis, which revealed that Wolfson had used morphine.
 {¶ 31} Stewart asked Wolfson to remove her long-sleeved shirt so Stewart could examine Wolfson's arms. Wolfson was wearing a T-shirt underneath the long-sleeved shirt. Stewart observed a purplish, blue spot on Wolfson's arm that Stewart believed was a drug injection point.
 {¶ 32} Stewart asked Carl Bowen, the Chief of Probation, to enter the room. Bowen asked Wolfson if she'd used drugs within the past few days. At first, Wolfson denied any drug use. Bowen said, "I can tell by your arm that you've used in the past few days." Wolfson again denied using drugs. However, Wolfson then stated, "Just wait a minute. Wait a minute. I'll tell you the story." Wolfson explained that a few days after she was arrested for alcohol intoxication, she and a friend had gone to someone else's house and used "MS Cotton," a synthetic morphine and Schedule II narcotic.
 {¶ 33} Stewart testified that condition #19 of Wolfson's community control sanctions states that she cannot use alcohol excessively to become intoxicated and act in an abusive or violent manner. Condition #7 says that Wolfson shall not lie or intentionally mislead the community control officers during any type of questioning. Condition #16 states that Wolfson shall not use, own, possess, or have immediate control over any type of controlled substance, drug, or narcotic, except on prescription by a physician. Stewart testified that Wolfson has not paid the fines and court costs assessed by the trial court, although she made one payment in March 2003.
 {¶ 34} On cross-examination, Stewart testified that relapses by drug users are common. The Bureau of Community Control does not always violate an offender when they first relapse, but bases the decision to violate an offender on the drug used and the offender's original charges. Stewart testified that Bowen asked Wolfson to tell the truth only one time, not repeatedly, when he spoke to her. Wolfson informed Stewart that she was involved in a physical altercation in Ashland, Kentucky and that she sought medical treatment for the injuries she received. Wolfson brought in a prescription for Tylenol III Codeine.
 {¶ 35} Stewart testified that Riche Diagnostics manufactures the drug screen she performed on Wolfson. Stewart does not know the accuracy rate of the test but has not witnessed any false positive tests. To test for drugs, Stewart inserts a strip into the urine sample supplied by the offender. If no line appears on the strip, the urine is positive for drugs. Different tests are used to test for different drugs.
 {¶ 36} Stewart testified that Wolfson had no previous false positive drug tests. Wolfson had already tested positive for morphine before she admitted her drug use. Stewart or Bowen had asked Wolfson to tell the truth for two to three minutes before Wolfson admitted using drugs and Bowen told Wolfson to tell the truth on only two occasions. Bowen was firm but not argumentative with Wolfson. Stewart acknowledged that the needle mark on Wolfson's arm could have been caused by something other than illegal drug use.
 {¶ 37} Carl E. Bowen, II testified that he is the Director of the Bureau of Community Control. Stewart informed Bowen that Wolfson tested positive for morphine and asked him to look at Wolfson's arms. Based on his observation of Wolfson's arms and the positive drug screen, Bowen questioned Wolfson about her drug use. Wolfson told Bowen that she had not used drugs but had been involved in an altercation with the man she was living with and he'd severely beaten her. When Bowen asked Wolfson about the marks on her arm, she said she gets nervous and pulls on her arm.
 {¶ 38} Bowen gave Wolfson his opinion of the cause of the marks — that she'd been using drugs — and Wolfson changed her story. She stated that she and a friend ran into another guy and decided to "hang out" with him for awhile. This guy "caught her in a weak moment" and she shot up MS Cotton. Bowen testified that Wolfson's actions violate conditions #16 and # 17 of her community control which prohibit illegal drug use and associating with others who use drugs.
 {¶ 39} On cross-examination, Bowen denied that he repeatedly demanded that Wolfson tell the truth and stated that he was firm but not loud and argumentative with Wolfson. Bowen testified that the decision to violate an offender for a drug relapse depends on the charge and the drug used. Generally, the Community Control Bureau is stricter about intravenous drug use and cocaine than other drug usage. Bowen acknowledged that the mark on Wolfson's arm could have come from having blood drawn.
 {¶ 40} Bowen testified that Wolfson began crying after she tested positive for drug use. Bowen continued questioning Wolfson because she claimed she was not positive for morphine. Bowen testified that he was unaware that Wolfson had been diagnosed as suffering from bi-polar disease, anxiety attacks, and severe depression, except through "hearsay." Bowen testified that he believes that Wolfson presented a prescription for Tylenol III Codeine.
 {¶ 41} Bowen denied that Wolfson recanted her statement about taking MS Cotton. Wolfson was worried only about whether she was going to jail. Wolfson stated that she was embarrassed that somebody beat her but expressed no shame about showing her bruised body to people.
 {¶ 42} Officer David Cannoy testified that he is a police officer with the Ashland Police Department in Kentucky. On the morning of July 8, 2003, Cannoy was dispatched to a domestic call with one injured person. When Cannoy arrived, Wolfson was standing outside yelling, cussing and "carrying on." When Cannoy walked up the steps to the house and approached Wolfson, he could tell she had been drinking. Wolfson stated that the man in the house had tried to kill her and had shoved her head through a glass window on the screen door. Cannoy observed a very small scratch on Wolfson and a few drops of blood.
 {¶ 43} Cannoy then spoke with the man in the house. The man stated that Wolfson tried to attack him and he held her off of him. She broke the window on her way out the door. The man did not appear intoxicated.
 {¶ 44} Cannoy placed Wolfson under arrest for alcohol intoxication, a crime in Ashland Cannoy testified that Wolfson smelled of alcohol and was unsteady on her feet. At one point, Cannoy had to sit Wolfson down while speaking with her. Cannoy also had to help Wolfson down the steps when he took her to the cruiser because she was unable to navigate them on her own.
 {¶ 45} On cross-examination, Cannoy testified that he does not believe Wolfson was beaten and she did not appear stunned. Wolfson reported receiving a head trauma during the altercation but refused treatment from the ambulance on the scene. Cannoy does not recall if the scratch on Wolfson was on her head or her arm. Although Wolfson requested a Breathalyzer test, Cannoy did not administer the test.
 {¶ 46} Wolfson wanted to file a complaint against the man but Cannoy refused to take the report. He advised Wolfson that she could come down to the police department once she was released and file a complaint, but she never did.
 {¶ 47} Sergeant Vickie Brice testified that she is the Deputy Jailer in Boyd County, Kentucky. On July 8th, Wolfson was transported to the Boyd County Detention Center after her arrest for alcohol intoxication and Brice observed her for approximately twenty minutes. Wolfson was initially combative and Brice had to restrain her to a bench. She appeared to be intoxicated. Brice testified that the prisoners are monitored by video at the detention center and Brice produced a videotape depicting Wolfson. The State played the videotape for the court.[1]
 {¶ 48} Brice testified that when Wolfson was first brought into the detention center, her handcuffs were removed. However, because Wolfson advanced towards Brice, Wolfson was handcuffed again and chained to a bench. Wolfson remained in jail for eight hours.
 {¶ 49} On cross-examination, Brice testified that Wolfson was irrational at the detention center, as evidenced by the tape. The standard procedure is to have the prisoner remove everything from their pockets, their jewelry, belt and shoelaces. Because Wolfson refused to comply, Brice had to remove Wolfson's earrings. Brice and other officers had to physically subdue Wolfson when she first arrived at the detention center. These actions were not recorded by the video camera because Brice had not yet been able to turn on the camera. Brice denied that Wolfson was placed in a choke hold. Brice testified that it took twenty to twenty-five minutes to book Wolfson. Booking does not usually take that long, but Wolfson refused to cooperate.
 {¶ 50} Brice testified that she did not observe any injuries to Wolfson, although Wolfson mentioned that she had been beaten that day. Brice testified that Wolfson was wearing jeans and a short-sleeved T-shirt. Brice did not notice any marks on Wolfson's arms and Wolfson did not request medical treatment while she was in custody.
 {¶ 51} In the defense case, Wolfson introduced the testimony of two witnesses and testified on her own behalf. Teresa Bloomfield testified that she is an Administrative Assistant employed by the Bureau of Community Corrections. On the date Wolfson reported for her appointment with her community control officer, Bloomfield saw Stewart take Wolfson for a urine test. When Wolfson and Stewart returned, Stewart asked Wolfson to remove her shirt.
 {¶ 52} Bloomfield testified that she did not observe any injuries to Wolfson's head, but saw bruising on the top of Wolfson's left hand and on her right forearm. Wolfson later stated that she had injected MS Cotton and that she injured her left hand by picking glass out of it. When Bowen spoke with Wolfson, he asked her to tell the truth about how she got the marks on her arm. Wolfson eventually admitted to Bowen that she used drugs. She stated that she'd been upset and left with someone named Jeremy. They walked to a house where someone offered Wolfson drugs which Wolfson used because she was in a vulnerable state. Wolfson appeared upset while she was talking to Bowen. Bloomfield did not hear Wolfson mention having a prescription for Tylenol III.
 {¶ 53} Jack Dennin testified that he is the Chief Constable with the Lawrence County Common Pleas Court. He was in the Community Control Bureau in July when Wolfson reported. Dennin testified that Stewart motioned for him to enter the room and, when he did, Wolfson was rubbing her arms. Stewart asked Wolfson what she was doing and Wolfson stated that her arm bothered her where her boyfriend had beaten her up the night before. Stewart asked Wolfson to remove her shirt and when she finally removed it, there were bruises. Bowen entered the room and saw what he believed to be a needle mark. Dennin testified that he did not notice any injuries around Wolfson's head or face.
 {¶ 54} Dennin testified that he was not present when the drug screen was administered to Wolfson, but was there when she received the results. Bowen told Dennin to arrest Wolfson. Wolfson said she'd been in a weakened state and they had injected her with drugs. Dennin did not hear Wolfson say that she was prescribed Tylenol III, but he did hear Wolfson say she had been in an altercation with someone who was outside the office that day.
 {¶ 55} Mary Wolfson testified that the videotape from the detention center did not reflect an officer holding her in a choke hold. Wolfson testified that she was very upset at the detention center because she had just been beaten and knocked unconscious for a period of time. Wolfson testified that she eventually escaped from the man who was beating her. He telephoned the police and Wolfson was waiting for them to arrive. When the officer asked Wolfson if she wanted to go to the hospital, she stated that she did not know. Wolfson testified that she was stunned because she had been subjected to head trauma and was experiencing blackouts. Although Wolfson requested a Breathalyzer, the officer refused.
 {¶ 56} Wolfson testified that she is no longer on her medication because she cannot afford it. Therefore, her behavior is more erratic than usual. She experiences blackouts, memory loss, emotional problems, and mental and emotional distress.
 {¶ 57} Wolfson testified that on the day she reported to the Community Control Bureau, she was wearing a form fitting shirt with a thin shirt over it to cover the bruises on her biceps and forearms. Wolfson did not wear the shirt to hide evidence of intravenous drug use. Bowen asked Wolfson to remove the shirt while she was waiting for the urinalysis results. Wolfson felt violated removing the shirt because she was ashamed that she had allowed someone to beat her. Bowen also asked Wolfson to remove her pants, but she refused.
 {¶ 58} Wolfson testified that after being grilled for fifteen to thirty minutes, she still maintained that she had not used illegal drugs. However, Wolfson eventually broke down in tears and made up a story that was "obviously unrealistic and facetious, to the point of being sarcastic, that [she] didn't think anyone would believe." Wolfson testified that she would have done anything to get out of that room because she could not handle it emotionally. Wolfson believes that she was coerced into giving a confession.
 {¶ 59} Wolfson told Bowen and Stewart that she walked a mile with her friend, Jeremy. They saw a man standing outside a gate who invited them in and gave Wolfson a syringe of MS Cotton. Wolfson testified that she does not know why she even said she used MS Cotton since that is not a drug she used when she was an intravenous drug user. Wolfson denied using MS Cotton and stated that she told Bowen a false story. Wolfson acknowledged that the conditions of her community control sanctions require her to be truthful with her probation officer; however, Wolfson testified that she kept repeating the truth but finally told them "what they wanted to hear."
 {¶ 60} Wolfson testified that Stewart told her she tested positive for drugs but did not tell her which drug was in her urine. Wolfson testified that she was taking several prescribed medications at the time of the urine test, including Tylenol III Codeine for pain.
 {¶ 61} Wolfson testified that she has not been found guilty of alcohol intoxication. When she reported to the Bureau of Community Corrections in July, there were track marks on her arms because she was an intravenous drug user for almost five years before receiving rehabilitation in August 2002. Wolfson testified that she has been clean of illegal drugs since then.
 {¶ 62} Wolfson testified that since her release in February, she has applied to work with several employers. Because of her mental disorder, a physical condition with her spine, past anorexia, and being crippled from 2001 to 2002, Wolfson has applied for social security income/social security disability. Wolfson recently learned that the Social Security Administration is reconsidering the status of her disability claim.
 {¶ 63} Wolfson testified that the employees of the Bureau of Community Corrections were aware of the emotional and mental duress she was under but did not take this information into account. Instead, they coerced, grilled and manipulated her into a confession.
 {¶ 64} On cross-examination, Wolfson testified that before going to jail in July, she was living with David Madden and his son. Madden is the man who assaulted Wolfson. Wolfson stated that she and Madden had not "made up," but he drove her to the Community Control Bureau for her appointment. Wolfson acknowledged that Madden was not arrested on July 8th, but she was. Wolfson denied drinking on that day but admitted she was yelling, screaming and cussing when Officer Cannoy arrived. Wolfson testified that there was alcohol in the house and Wolfson was wet and likely "had things poured on her."
 {¶ 65} Wolfson admitted that her behavior at the detention center was bizarre and erratic, but blamed her behavior on her bi-polar disorder. She testified that she was feigning orgasms in the videotape. Wolfson denied refusing medical treatment. Wolfson denied continuing to live with Madden after he allegedly beat her. She testified that Madden left and she continued to live in the house. However, Wolfson then stated that Madden worked a lot and she only saw him at the house for five to ten minutes per day. Wolfson testified that she only lied to the people at the Bureau of Community Control when she said she used MS Cotton.
It is ordered that the Judgment be Affirmed and that the Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Lawrence County Common Pleas Court to carry this judgment into execution.
If a Stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Kline, P.J. and Abele, J.: Concur in Judgment and Opinion
[1] The State did not move the videotape into evidence because it was the original tape. Defense counsel did not object, but asked that the officers not destroy the tape in case of appeal. The trial court then released the original tape. Wolfson has made no attempt to supplement the record with a copy of this videotape. Therefore, we have not reviewed this tape in deciding Wolfson's appeal.